871 P.2d 1158

**MAIL BOXES, ETC., U.S.A.,**
Petitioner Employer,

**State Compensation Fund,**
Petitioner Carrier,

v.

**The INDUSTRIAL COMMISSION
OF ARIZONA, Respondent,**

**Patrick Loser, Respondent Employee.**

No. 1 CA–IC 92–0030.

Court of Appeals of Arizona,
Division 1, Department E.

Aug. 26, 1993.

Review Granted as to one Issue,
Denied on all other Issues
April 11, 1994

Long, Lester & Lundmark, P.A. by James B. Long, Phoenix, for petitioners Employer and Carrier.

Anita R. Valainis, Chief Counsel, Indus. Com'n of Arizona, Phoenix, for respondent.

Jerome, Gibson, Stewart, Friedman & Stevenson, P.C. by Donald F. Schaar, Phoenix, for respondent Employee.

## OPINION

GERBER, Judge.

This is a special action review of an Arizona Industrial Commission award establishing a sole proprietor's average monthly wage for purposes of a permanent disability award. One issue is presented: whether the Administrative Law Judge (ALJ) erred by relying on hypothetical earnings of a fictitious employee to establish the respondent employee's (claimant's) average monthly wage. Because the ALJ erroneously applied Ariz.Rev. Stat.Ann. ("A.R.S.") section 23–901(5)(i) (Supp.1992) in establishing claimant's average monthly wage, we set aside the award.

## FACTS AND PROCEDURAL HISTORY

In April 1989, claimant purchased a franchise from the petitioner employer, Mail Boxes, Etc., U.S.A. (Mail Boxes). On April 10, 1989, he contacted the petitioner carrier, State Compensation Fund (Fund), to obtain workers' compensation insurance for his business, including sole proprietor coverage for himself.

On December 12, 1989, claimant fell and sustained industrial injuries to both knees. He filed a workers' compensation claim, which was accepted for benefits. On June 18, 1990, his average monthly wage was fixed at the amount of $1650 per month. Approximately one year later, his claim was closed with a permanent impairment. This closure notice computed the average monthly wage at $0 per month for purposes of permanent disability benefits. The claimant timely requested a hearing. At two ensuing hearings, testimony came from the claimant, two certified public accountants, and the Fund's underwriting department representative.

Claimant testified that after purchasing the Mail Boxes franchise, he immediately obtained workers' compensation coverage from the Fund. He stated that he read the application for sole proprietor coverage before he signed it and understood that in the event of injury the compensation benefit he would receive would be based on a figure of $1650 per month. He also stated that the franchise was his primary source of income and that he worked Monday through Saturday, approximately 55 hours per week, with additional time during the Christmas holidays.

Claimant further testified that his knee injuries required medical treatment, including surgery, and resulted in permanent impairment. He stated that he sold his business in August 1990 because his injuries would have made it necessary for him to hire a store manager at approximately $8 per hour.

Claimant explained that when he purchased Mail Boxes, he paid the former owners approximately $4,000 and assumed a $40,000 note. He loaned the business approximately $20,000 from his personal funds. He stated that he reported no personal in-

come on his 1989 federal income tax return and that there was no profit from his Mail Boxes business in 1989.

Larry Counts testified on behalf of the Fund's underwriting department. He stated that on April 11, 1989, the Fund bound coverage for claimant. Claimant then signed and returned a written application for sole proprietor coverage, which was accepted by the Fund. Counts explained that sole proprietor coverage is not mandatory but is allowed by statute. He stated that claimant was charged a premium based on an assumed average monthly wage of $1650 per month and that he paid approximately $300 per quarter for this coverage. He also stated that claimant was paid $11,266 in medical benefits and $6,669.60 in temporary disability benefits following his industrial injuries.

Deborah J. Fagan, a certified public accountant, testified that she became the accountant for claimant's business beginning in December 1989. She stated that sole proprietors do not earn wages but instead receive draws against the net profit of the business. Sole proprietors do not receive wages because they cannot be their own employees; as a sole proprietor, the business and the claimant are the same entity.

Fagan further testified that in December 1989, claimant drew $3400 out of his business as a partial loan repayment of the initial $20,000 investment he made when he purchased the business; that from April through December 1989, claimant showed a net loss of $3976; and that during the same period he made capital expenditures of $10,716.20. Fagan stated that, considering the capital expenditures, claimant actually had a 1989 profit of $6740.20.

Steven M. Kopp, a certified public accountant, testified on behalf of the Fund. He stated that he had reviewed claimant's business records for April 1989 through August 1990. Contrary to Fagan, he concluded that the claimant had no earned income in 1989. He explained that a sole proprietor's wages are actually the earned income of the business. After reviewing claimant's federal income tax returns, financial statements and general ledger, Kopp stated that these documents reflected a loss in 1989.

Kopp testified that the $3400 payment to claimant in December 1989 did not represent earned income; instead, it was part of the initial $20,000 loan that claimant made to the business in April 1989. He stated that any money claimant took out of the business in 1989, including funds used for various capital expenditures, was part of this original loan because the business had no earned income.

Kopp further testified that the claimant made a profit in December 1989, but it was insufficient to offset losses incurred from April through November 1989. He stated that although Mail Boxes lost money in both 1989 and 1990, claimant made a profit when he sold the business. However, this profit was return on an investment, not earned income for the business.

On December 13, 1991, the ALJ entered an award setting claimant's average monthly wage at $1650 per month for purposes of permanent disability benefits. After the award was summarily affirmed on administrative review, the Fund brought this special action.

## DISCUSSION

■ The Fund argues that A.R.S. section 23–901(5)(i) and claimant's insurance contract both manifest a clear intent that compensation for permanent disability is to be computed on the basis of the lesser of the assumed average monthly wage or claimant's actual average monthly wage at the time of injury. Arizona Revised Statutes Annotated section 23–901(5) provides in pertinent part:

(i) The sole proprietor of a business subject to the provisions of this chapter may be deemed to be an employee entitled to the benefits provided by this chapter on written acceptance, by endorsement, at the discretion of the insurance carrier of an application for coverage by the sole proprietor. The basis for computing premium payments and compensation benefits for

the sole proprietor shall be an assumed average monthly wage of not less than six hundred dollars nor more than the maximum wage provided by § 23–1041 and is subject to the discretionary approval of the insurance carrier. *Any compensation for permanent partial or permanent total disability payable to the sole proprietor shall be computed on the lesser of the assumed monthly wage agreed to by the insurance carrier on the acceptance of the application for coverage or the actual average monthly wage received by the sole proprietor at the time of injury.*

(Emphasis added.)

In accordance with this statute, claimant's application for sole proprietor coverage stated:

The sole proprietor of a business subject to the provisions of this chapter may be deemed to be an employee entitled to the benefits provided by this chapter on written acceptance by endorsement at the discretion of the insurance carrier of an application for coverage by the sole proprietor. The basis for computing premium payments and compensation benefits for the sole proprietor shall be an assumed average monthly wage of not less than $600 nor more than the maximum wages provided by Section 23–1041 and is subject to the discretionary approval of the insurance carrier. *Any compensation for permanent partial or permanent total disability payable to the sole proprietor shall be computed on the lesser of the assumed monthly wage agreed to by the insurance carrier on the acceptance of the application for coverage or the actual average monthly wage received by the sole proprietor at the time of injury.*

(Emphasis added.) This application for coverage was signed by the claimant on April 25, 1989 and was approved and accepted by the Fund on May 17, 1989.

Applying the statutory and contractual provisions to the facts in this case, the ALJ found:

15. Evidence at hearing indicates applicant did not draw out monies for himself that would indicate wages paid. Evidence did establish that for year 1989, applicant's business did sustain losses in excess of $3,000.00. While business did generate profit in month of December, such is an unusual month in Mail Box business and cannot be construed as being representative of moneys [sic] earned on an average monthly basis. Business was sold 20 months after date of injury at a profit of $2000.00. Such also should not be used as a basis for wages earned as of date of injury.

16. Applicant's testimony reflected that if applicant had hired a general manager to perform work applicant was engaged during course of employment, such general manager could be hired for $8.00 per hour. Applicant further testified on average he worked 50 hours per week. Based upon objected to but unrefuted evidence, applicant's services were then worth $1733.20 per month as of date of injury.

17. While it is recognized applicant sustained a loss in 1989, it is further recognized that if operated only as an investor or owner of business, his losses would have increased by approximately $1733.32 per month.

. . . .

19. It is deemed for permanent disability compensation purposes, applicant's average monthly wage should be recalculated to be $1650.00 maximum per month.

Although it was not explicitly stated, the ALJ impliedly based his award of $1650 per month for permanent disability benefits on the basis that claimant would have had to pay a general manager $8 per hour, 50 hours per week, to perform the work that he performed at Mail Boxes. *See Pearce Development v. Industrial Comm'n,* 147 Ariz. 582, 583, 712 P.2d 429, 430 (1985) (findings implicit in an ALJ's award). The Fund argues that this reliance on wages of a fictitious general manager to establish the average monthly wage is erroneous and requires the award to be set aside. We agree.

In Finding No. 15, the ALJ acknowledges that claimant received no wages in 1989 be-

cause Mail Boxes sustained a loss in excess of $3000 that year. Despite recognition that claimant had no wages at the time of his 1989 industrial injury, the ALJ refused to apply that portion of A.R.S. section 23–901(5)(i) which requires that the lesser of the assumed wage and the actual wage be a basis for computing permanent disability benefits.

■ Claimant disputes the recomputation of the average monthly wage for several reasons. First, he argues that the June 18, 1990 notice of average monthly wage is res judicata for all purposes. In support of this proposition, he cites *Shaw v. Industrial Comm'n*, 109 Ariz. 401, 510 P.2d 47 (1973), and *Robinson v. Industrial Comm'n*, 14 Ariz. App. 541, 484 P.2d 1070 (1971).

Although both *Shaw* and *Robinson* stand for the general proposition that an unprotested notice of average monthly wage is res judicata, neither case deals with a sole proprietor or involves A.R.S. section 23–901(5)(i). This court expressly recognized exceptions to this general rule. *Robinson*, 14 Ariz.App. at 541, 484 P.2d at 1070. Although this notice is res judicata as to claimant's average monthly wage for purposes of temporary disability benefits, it cannot be res judicata as to permanent disability benefits because such an interpretation would directly contradict A.R.S. section 23–901(5)(i).

■ Claimant next argues that the Fund should be estopped from utilizing his actual average monthly wage at the time of injury for calculating permanent disability benefits because it charged insurance premiums based on the assumed average monthly wage of $1650 per month. In order to invoke the doctrine of equitable estoppel, an individual must have reasonably relied to his detriment on the acts, promises, and representations of the adverse party. *Graham v. Asbury*, 112 Ariz. 184, 186, 540 P.2d 656, 658 (1975). This court has noted that estoppel is inapplicable where neither the employer nor the carrier perpetrated any fraud or deliberate deception. *See McKaskle v. Industrial Comm'n*, 135 Ariz. 168, 170, 659 P.2d 1313, 1315 (App.1983).

In this case, there is no fraud or deception which would support a claim of equitable estoppel. The parties bargained for an insurance contract at an agreed-upon premium. The contract provided that an assumed average monthly wage be a basis to compute premiums and temporary disability benefits. It also provided that the lesser of that assumed average monthly wage or the actual average monthly wage be a basis for computing permanent disability benefits. These provisions were contained in the application for insurance, which the claimant acknowledged that he read and signed.

■ Claimant next argues that the portion of A.R.S. section 23–901(5)(i) which allows a recomputation of the average monthly wage for permanent disability benefits is unconstitutional. The Fund responds that this argument was not adequately preserved for appeal and, further, that creating a statutorily enumerated class of covered workers such as this one does not violate the constitution.

■ This court will not ordinarily consider an issue on appeal that was not raised before the Industrial Commission, *Norsworthy v. Industrial Comm'n*, 24 Ariz.App. 73, 74, 535 P.2d 1304, 1305 (1975). However, we will review matters which are in the record. *See Stephens v. Industrial Comm'n*, 114 Ariz. 92, 95, 559 P.2d 212, 215 (App.1977). In this case, the issue of constitutionality was raised before the Industrial Commission. The ALJ addressed this issue explicitly:

14. Applicant has challenged last sentence of A.R.S. § 23–901 5(i) as being unconstitutional. However, an administrative agency must assume the constitutionality of the Statutes under which it operates and enforces. *Arizona Corporation Commission v. Tucson Gas & Electric Light & Power co., [sic]*, 67 Ariz. 12, 189 P.2d 907 (1958). It is deemed Statute providing for termination of benefits based on rcalculated [sic] average monthly wage is constitutional until otherwise decided upon by higher authority. Average monthly wage may be recalculated to a lesser figure in accordance with A.R.S. § 23–901 5(i).

The Fund also argues that a request for affirmative relief was necessary to raise constitutionality. A party seeking affirmative relief from the court of appeals in a special action review of an Industrial Commission award must include a request for that relief in the notice of appearance. *See Neitman v. Industrial Comm'n,* 20 Ariz.App. 53, 55, 510 P.2d 52, 54 (1973). Affirmative relief need not be requested in order to present alternative bases for sustaining an award unless relief beyond that awarded is sought. *See Stiles v. Industrial Comm'n,* 25 Ariz.App. 543, 545, 545 P.2d 54, 56 (1976).

Here, claimant obtained an award setting his average monthly wage at $1650 per month for purposes of permanent disability benefits. The constitutionality of A.R.S. section 23–901(5)(i) was raised below by claimant in support of his argument against recomputation of the average monthly wage. The ALJ applied the statute, assuming its constitutionality, in reaching his award; however, he made no independent constitutional determination. On appeal, claimant urges this court to both affirm the award of $1650 per month and declare the statute unconstitutional. Because claimant seeks more than a mere affirmance of the award, a request for affirmative relief was necessary.

Assuming *arguendo* that a request for affirmative relief was not necessary, we address claimant's argument that recomputation of the average monthly wage for purposes of permanent disability benefits is an unconstitutional denial of workers' compensation benefits provided for by Article 18, section 8 of the Arizona Constitution, which states in relevant part:

> The percentages and amounts of compensation provided in House Bill No. 227 enacted by the Seventh Legislature of the State of Arizona, shall never be reduced nor any industry included within the provision of said House Bill No. 227 eliminated except by initiated or referred measure as provided by this Constitution.

This provision was enacted in 1925 and applied to workers' compensation benefits for employees of an employer. Sole proprietors were not included in this provision; they did not have workers' compensation insurance available to them in Arizona until 1985, when the legislature made it available by statute. *See* Laws 1985, Ch. 136, § 1. Because sole proprietors are part of a statutorily enumerated class of workers created by the legislature, it was within the legislature's discretion to prescribe the manner and extent of those benefits.

Finally, claimant argues that the ALJ's conclusion that he had an average monthly wage of $1650 per month is reasonably supported by the evidence. Typically, wages earned during the 30 days preceding the industrial injury are the presumptive average monthly wage. *See Davis v. Industrial Comm'n,* 134 Ariz. 293, 295, 655 P.2d 1345, 1347 (App.1982). Claimant has the burden of proving all elements of the average monthly wage. *Zapien v. Industrial Comm'n,* 12 Ariz.App. 334, 336, 470 P.2d 482, 484 (1970). In establishing an average monthly wage, the Industrial Commission considers actual, not speculative, earnings. *See Insurance Company of North America v. Industrial Comm'n,* 116 Ariz. 21, 25, 567 P.2d 337, 341 (App.1977). The ALJ may use an expanded wage base when the presumptive base does not realistically reflect earning capacity. *ELCO Veterinary Supply v. Industrial Comm'n,* 137 Ariz. 46, 48, 668 P.2d 889, 891 (App.1983).

Here, both of the certified public accountants testified that a sole proprietor's wage is equal to the earned income of his business. Fagan testified that although claimant showed a net loss for 1989 of $3976.00, considering his capital expenditures, he actually had a profit of $6740.20. Kopp contradicted that testimony. He stated that capital expenditures did not affect earned income because capital expenditures represented loans from claimant to the business. Kopp stated that claimant's business had a $3976.00 loss in 1989, and thus claimant did not earn any wages. The ALJ resolved these conflicts in favor of Kopp and found that no wages were

paid to claimant in 1989. Based on the ALJ's resolution of the evidentiary conflicts, there is no support for finding that claimant had an average monthly wage of $1650 in 1989.

## CONCLUSION

For all of the foregoing reasons, the award is set aside.

VOSS, P.J., concurs.

LANKFORD, Judge, dissenting.

This appeal presents a particularly troublesome issue. On the one hand, the claimant paid premiums for insurance against a loss of earning capacity due to an industrial injury. Yet his insurer asserts that no compensation need be paid for his permanent disability because he was working as the sole proprietor of an as yet unprofitable business at the time of the injury. In light of the basic public purpose of workers' compensation to provide compensation, this result seems unjust.

On the other hand, as the majority opinion ably argues, both the insurance policy and the governing statute appear to limit this claimant's compensation to his "actual average monthly wage" at the time of the injury. Claimant was receiving no wages at that time.

My resolution of this conflict differs from the majority's. Because the governing principle in this case is the legislative goal of compensating those disabled by industrial accidents, and because the statutory language is amenable to the award of some compensation, I would affirm the award. I therefore must respectfully dissent.

The legislative purpose of the workers' compensation system must be considered first. In any attempt to discern the meaning of statutes, courts strive to find and effectu-

ate the Arizona Legislature's purposes. "Our ultimate duty is to implement legislative intent," we said in *Canon Sch. Dist. v. W.E.S. Constr. Co.*, 174 Ariz. 269, 272, 848 P.2d 848, 851 (App.1992).

We need not look far for indications of the purpose of workers' compensation. Our supreme court recently discussed that question in a decision which allowed more liberal disability benefits by including in the calculation of the worker's average monthly wage those wages from concurrent dissimilar employment. In *Wiley v. Industrial Comm'n*, 174 Ariz. 94, 847 P.2d 595 (1993), the court said:

"[T]he underlying purpose of compensation law ... is to estimate accurately the claimant's earning capacity and provide compensation bearing a proper relation to it." 847 P.2d at 603, (quoting 2 Larson *Workmen's Compensation* § 60.32, at 10–729 (1992)). And in *Senor T's Restaurant v. Industrial Comm'n*, 131 Ariz. 360, 363, 641 P.2d 848, 851 (1982), our supreme court stated:

"The underlying purpose of the Workmen's Compensation Act is to compensate an employee for lost earning capacity and to prevent the injured employee and his dependents from becoming public charges during the period of disability." (Citations omitted). The compensatory purpose of the Act has long been the guiding hand in our decisions on workers' compensation questions. "For six decades," the supreme court wrote in *Wiley*, "we have endeavored to construe the Act broadly to effectuate these underlying purposes." 847 P.2d at 601.[1]

This consistent approach of honoring the Legislature's intent to compensate workers renders suspect the outcome reached by the majority here: the denial of benefits to a worker who was concededly industrially injured, admittedly permanently disabled, unquestionably covered by the compensation system and clearly insured by a policy on which premiums were paid for disability protection.

---

1. "Primary purposes of the Act include compensating claimants 'for lost earning capacity,' ... preventing claimants from becoming public charges during any period of disability, ... re-

lieving employees of the burden of compensable injuries, ... and diminishing litigation between claimants and employers or insurance carriers ..." (*Id.;* citations omitted).

The majority nevertheless finds itself constrained to deny benefits by what it sees as the unambiguous language of the statute and the insurance policy. I therefore turn now to this language.

The language of the insurance policy mimics the statute, and thus both may be examined together. The essential question which these provisions present is this: does a sole proprietor, who works in a business which does not generate net earnings, have an "actual average monthly wage" upon which disability compensation may be calculated?

The majority reads the statutory language as having only one meaning and as demanding that a sole proprietor in an unprofitable business cannot be compensated. While courts are ordinarily bound by clear statutory language, they are not compelled to follow superficially clear language to absurd results. *See Marquez v. Rapid Harvest Co.*, 89 Ariz. 62, 64, 358 P.2d 168, 170 (1960); *Walls v. Arizona Dep't of Pub. Safety*, 170 Ariz. 591, 594, 826 P.2d 1217, 1220 (App.1991). Instead, the courts try to reach sensible results by fulfilling the Legislature's intent. "The primary principle of statutory construction is to determine and give effect to legislative intent." *Wyatt v. Wehmueller*, 167 Ariz. 281, 284, 806 P.2d 870, 873 (1991).

A result which denies all benefits to an injured and disabled worker manifestly conflicts with legislative intent. That outcome is contrary to the fundamental legislative policy of compensation for those who are disabled from earning a living by industrial injury. In light of the overall legislative purpose of compensation and our longstanding jurisprudence liberally construing the Act to achieve that purpose, the extraordinarily harsh result of denying all benefits is so contrary to public policy that it cannot be what the Legislature intended. Even if the statutory language appears clear enough, we cannot follow it to a result—the complete denial of benefits to a covered, injured worker—which is opposite of the Legislature's goal. Our supreme court said in an earlier workers' compensation decision:

It is ... almost universally held that when the literal language of a statute will result in ... a meaning which, from the general context of the statute, is clearly at variance with the legislative intent, courts may and will alter, modify, or supply words to the statute in order to give effect to the manifest intention of the Legislature.

*State v. Pressley*, 74 Ariz. 412, 422, 250 P.2d 992, 998 (1952) *quoting Keller v. State*, 46 Ariz. 106, 117, 47 P.2d 442, 447 (1935).

Although even facially unambiguous language should not be read in a manner directly at odds with the Legislature's intention, I am also unconvinced that the statute can be read only the way suggested by the majority. Legislative history fails to reveal consideration by the Arizona Legislature of the precise problem at hand. On the contrary, a provision which denies all compensation to an injured, disabled and covered worker seems wholly out of place with the workers' compensation statutory scheme.

Nor does the statutory language specifically address this case. The statute creates a general rule which the majority extends to this case by seemingly straightforward application. But what if the Legislature did not foresee this case and therefore simply omitted a provision to cover it? The general rule, found in A.R.S. section 23–901(5)(i) (Supp. 1992), results in compensation whenever the sole proprietor has either received wages or net earnings and thus works well enough in most situations. The present case is not typical, however. If it had considered this situation, would the Legislature have preferred for us to deny benefits to the injured claimant or to affirm the ALJ's award of benefits? Would it have decided to deny the sole proprietor benefits because his business was not yet profitable or to allow the ALJ to award benefits based on an imputed "actual" wage? Given the overall compensatory purpose of the Act, it seems almost certain that the Legislature would have provided for benefits in this situation.

The majority opines that the Legislature has already spoken on this matter by pre-

scribing the method of calculating permanent disability payments to a sole proprietor. The statute provides that the disability payment will be "computed on the *lesser* of the assumed monthly wage agreed to by insurance carrier ... or the *actual* average monthly wage received by the sole proprietor at the time of injury." A.R.S. § 23–901(5)(i) (emphasis added). Because the worker's net earnings from the business were zero, the majority reasons, his "actual wage" was zero, and zero is the "lesser" amount.

Although the majority's reasoning is direct, it overlooks some important considerations. "To find legislative intent, an appellate court may consider many different factors. These factors include the context of the statute, the language used, the subject matter, its historical background, its effects and consequences, and its spirit and purpose." *Wyatt*, 167 Ariz. at 284, 806 P.2d at 873. Thus, the statutory language, though powerful evidence of legislative intention, is only one of many indicia of the Legislature's plan.

The majority's construction is not the only way to read this statute. In my view, the statutory language is not as clear as it first seems. The Legislature apparently contemplated that two sums—the assumed wage and the "actual" wage—be compared. However, there is no actual wage here because the "employee," as the owner of the business, did not pay himself wages. Instead, he apparently plowed all revenues back into the business in an attempt to make it economically viable.

It is not clear that the Legislature intended that the worker receive no disability compensation when no wages were actually paid. It seems at least equally likely that the Legislature intended to compare two amounts, both greater than zero, and arrive at a "lesser" amount. In fact, the apparent object of the statute is to make the "assumed monthly wage" a cap on benefits, not to reduce benefits to zero when "actual wages" are not paid. This seems the more likely construction when it is remembered that the Act's basic purpose is to compensate injured workers. Moreover, a conceptual difficulty suggests that the statute does not bar all compensation on the basis that the wages were zero: this employee was not being paid a wage in the amount of zero; rather, this employee did not receive "wages". The difference is like that between having an empty cup (wages of zero) and no cup at all (the employee was not a wage earner). Because the statute can easily be read as contemplating that there be both a cup and something in it (i.e., that *some* wages have been paid) before actual wages are used to calculate compensation, that construction is preferred. In my judgment, that reading better serves the legislative goal of compensating injured workers for lost earning capacity. "We decline to adopt a literal, wooden application of this legislation [because] [t]o do so would be unfaithful to the Legislature's wishes." *Canon Sch. Dist. v. W.E.S. Constr.*, 174 Ariz. at 272, 848 P.2d at 851.

Another consideration favoring compensation is that, by statute and our prior decisions, the term "actual wages" is not interpreted literally and narrowly.[2] Instead, workers may recover benefits based on the extrapolation of the employee's historical wages or estimation of wages received by other workers. For example, in *Pena v. Industrial Commission*, 140 Ariz. 510, 683 P.2d 309 (App.1984), we held that the earning capacity of an employee who had not worked in the period immediately preceding his death could be calculated by any of three formulas: (1) extrapolation of the employee's daily wage; (2) estimation based on similar employees engaged in similar employment in the locality; and (3) determination from prior wages paid to the worker in that job. The reliance on other employees' wages to estimate the injured or killed worker's wages was specifically authorized by the Legislature. A.R.S. § 23–1041(B).

**2.** In fact, the majority readily accepts that, in a sole proprietor situation, the claimant need not have "actual wages" but that the loss may be calculated based on "net earnings" of the claimant's business. This further illustrates the malleability of the term "actual wages."

The ALJ's calculation of "actual wages" in this case, based on uncontroverted evidence of what an outside worker would receive for performing this employee's job, is closely analogous to the statutory provision and to the second formula mentioned in *Pena*. In the cases of both the worker who had not been working immediately before his injury and thus had no actual wages at the time of injury and the worker who is the sole proprietor of an unprofitable business, the legislative policy favoring compensation is best effectuated by permitting data other than "actual wages" to serve as the basis for calculating disability benefits.

After all, the "actual wage" concept is only a means to an end. The goal is to compensate the worker for *future* loss of earning capacity. Actual wages at the time of injury represents *past* wages, which is one method—indeed, ordinarily the best method—of measuring the future loss. I cannot agree that when the ordinary method of measurement proves unworkable we should simply give up the idea of compensating the worker. Even a worker who has a history of erratic earnings, or no earnings, may sustain a future economic loss due to disability. It is difficult to believe that, despite the compensatory goal of the Act, the Legislature intended to disenfranchise the worker merely because his loss cannot be measured with precision.

Yet another consideration supporting the ALJ's decision is that other states have allowed similar wage calculations in like circumstances, mainly those involving partner-employees. The sole proprietor situation here is much like that of a partnership: in both cases the employee and the owner of the business is the same. *Compare* A.R.S. § 23–901(5)(h) (Supp.1992) (coverage of partners) *with* § 23–901(5)(i) (Supp.1992) (coverage of sole proprietors). In *Wilkerson v. B & J Used Furniture*, 221 Mont. 250, 718 P.2d 338 (1986), the two partners in a used furniture store were injured on their fourth day of business. Although there was no evidence of actual earnings because the business was new, an award of benefits was based on the estimated payroll for the business divided by the number of employees. The appellate court affirmed, finding that the decision "arrived at a fair estimate of claimants' future earning capacity, from the evidence presented in this unique case." 718 P.2d at 340. The court emphasized that "[t]he entire objective of computation of average weekly wages is to arrive at as fair an estimate as possible of claimant's future earning capacity" in holding that "[t]he brevity of the claimants' employment ... is of no relevance in computing their rights to workers' compensation." *Id.* (citations omitted).

Similarly, the objective of A.R.S. section 23–901(5)(i) is to estimate future earning capacity so that its loss may be fairly compensated. That the sole proprietor's business was not generating net earnings at the time of injury does not mean that the owner-worker would never have earnings in the future. Therefore, an estimate as fair as possible under admittedly difficult circumstances is preferable to simply awarding no compensation.

Another similar case is *Hines v. Divers World Enterprises, Inc.*, 158 A.D.2d 831, 551 N.Y.S.2d 416 (1990), in which the decedent was a diver who drowned while working for a business owned by decedent and his wife. Although the worker was entitled to a weekly salary, he drew none: the earnings remained in the corporate treasury. Nevertheless, benefits were awarded—and the award was sustained on appeal—by estimating wages based on the rate the business would have paid outside divers for similar services. This is the same method used by the ALJ here in estimating the worker's wages.

A final consideration is that, as both parties agree, the claimant here paid an insurance premium calculated on the assumption that the amount of disability benefits would be $1650 per month. The claimant also testified that he understood that he would be paid benefits in that amount if he were to suffer disabling injury. Because the insurer assessed and received premiums based on the mutual assumption that benefits would be

paid, it would be a windfall to the insurer and an unexpected financial catastrophe to the insured to deny all benefits.

In sum, I believe that A.R.S. section 23–901(5)(i) should be interpreted as contemplating that *some* disability benefits are recoverable by a sole proprietor who receives no wages. The benefits should be calculated as the lesser of the assumed monthly wage or the "actual" wage as estimated in the manner employed by the ALJ here. This better serves the ultimate legislative purpose of providing compensation. For that reason, I would affirm the award.